GOOSEN *v.* PACKARD MOTOR CAR CO.

1. NEGLIGENCE—STREETS—EVIDENCE—AUTOMOBILES.

Plaintiff's testimony that he fell from a bicycle which he was riding, about 100 feet in advance of defendant's motor truck, that he signaled by waving his arm, but the driver did not observe him and ran over plaintiff as he lay helpless on the pavement, although contradicted by defendant's witnesses, was sufficient to require the submission of the case to the jury.

2. EVIDENCE—NEGLIGENCE—MOTOR VEHICLES.

The report made by a patrolman concerning a personal injury accident which he did not witness, being incompetent, was correctly excluded.

Error to Wayne; Codd, J. Submitted November 20, 1912. (Docket No. 101.) Decided April 8, 1913.

Case by James Goosen by his next friend against the Packard Motor Car Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Keena, Lightner, Oxtoby & Oxtoby,* for appellant.

*Cullen, Casgrain & Hanley,* for appellee.

MOORE, J. This is an action to recover damages for personal injuries. The plaintiff, at the time of his injury, a lad of 13 years of age, was riding a bicycle in the easterly direction upon Jefferson avenue, in the city of Detroit. He was accompanied by a companion some three years older than himself. When near McDougall avenue, the boys overtook a motor truck belonging to defendant. The truck likewise was proceeding easterly upon Jefferson avenue. It was a heavy service truck weighing about three tons, and capable of carrying a load of equal weight, and was running at a speed of from 8 to 10 miles per hour. It was in charge of one Heberling, an experienced driver, who was accompanied by one Long. Both these men were employés of defendant, and were at the time of the accident returning to the Packard factory with a load of freight. Having overtaken the truck, the plaintiff and his companion determined to pass it. In doing this plaintiff turned out to the left, while his companion turned out to the right. After passing the truck, the plaintiff in some manner fell in front of the truck, and the left front wheel passed over his legs causing very serious and permanent injuries. The truck, which had a wheel base of 125 inches, was stopped by Heberling before the rear wheel passed over the plaintiff. The accident occurred upon a wide street paved with asphalt, at about 8:30 o'clock in the morning. It had been raining prior to the time of the accident and the pavement was still wet. Plaintiff was an experienced rider of a bicycle. In run-

ning over plaintiff the truck did not swerve from the straight course upon which it was proceeding. These facts are all undisputed upon the record.

The plaintiff alone was sworn in his own behalf as to the manner in which the accident occurred. He testified that in passing the truck he traveled between the southerly street car track and the truck, about three feet south of the car track; that while going ahead *upon a straight course* and when approximately 100 feet ahead of the truck his wheel slipped and he fell, his feet being toward the truck and his head toward the street car track. He further testified:

"*Q.* Did you become entangled with the bicycle?

"*A.* Yes, my leg got tangled in the wheel; there was a little cut there.

"*Q.* What did you see the motor truck do at the time?

"*A.* I was looking towards it and saw it coming when the fellow on the left side had his head down like that and the other fellow driving was looking towards the river.

"*Q.* Did you try to get out of the way?

"*A.* Yes, but I could not, though.

"*Q.* Why not?

"*A.* Because my leg hurt and I was caught by the wheel and could not.

"*Q.* Were you right in line with the truck?

"*A.* Yes.

"*Q.* Did the truck turn around away from you or stop?

"*A.* No, sir.

"*Q.* What happened?

"*A.* It went right over me.

"*Q.* Did you do anything after it run over you?

"*A.* No, sir."

Upon cross-examination:

"*Q.* Do you recollect that September, this last September, the 21st of September in room No. 1, Judge Mandell tried this case?

"*A.* Yes.

"*Q.* The trial was there then?

"*A.* Yes.

"*Q.* And Charlie was there?

"*A.* Yes.

"*Q.* And you were there?

"*A.* Yes.

"*Q.* And you were both in the room when the other spoke?

"*A.* Yes.

"*Q.* Jimmie, do you recollect that at that time—don't look at Mr. Hanley now—don't you recollect at that time, Jimmie, that you told us that after you got ahead of the truck you started to go into the curb, and when you were on a slant that your bicycle slipped?

"*A.* Maybe I did, I forget now.

"*Q.* Is that true?

"*A.* I cannot say.

"*Q.* You ask whether or not, whether that statement is true, that you turned into the curb?

"*A.* No, sir; it was not true; I was not turning in; I was going straight.

"*Q.* You now say that you were going straight ahead from the time you were alongside of the truck and that you did not turn either way?

"*A.* Yes.

"*Q.* That is what it is now?

"*A.* Yes, sir.

"*Q.* And that is true?

"*A.* Yes.

"*Q.* But back in Judge Mandell's room you told us that you had turned to go into the curb to join Charlie Schneider?

"*A.* I don't know.

"*Q.* Now, of course, at that time, Jimmie, Mr. Hanley asked you questions first just as he did here?

"*A.* Yes.

"*Q.* Is that true—I call your attention to his transcript, and I ask you whether Mr. Hanley did not ask you this: ' *Q.* After you got ahead of the truck what happened to you and your bicycle? *A.* I was about 100 feet ahead of the truck, over 100 feet and my wheel slid when I was slanting across to the curb.'

"*A.* Yes, I guess so; I don't know if I did or not.

"*Q.* Don't you know that is it?

"*A.* I says that—let us see it. Yes, that is it there.

"*Q.* Now, afterwards, after Mr. Hanley was through, did I ask you some questions?

"*A.* Yes.

"*Q.* I ask you, Jimmie, whether at the time, when I

was asking you questions before Judge Mandell, if I did not ask you, I asked you about the truck keeping straight ahead?

"*A.* Yes.

"*Q.* The truck kept straight ahead?

"*A.* Yes.

"*Q.* Did I ask you this question: '*Q.* If that is so, that the truck kept straight ahead and you kept straight ahead and you passed the truck, don't you know that the truck would not hit you? *A.* When I turned in a slanting-wise towards the curb, when I got ahead.' Did you answer like that?

"*A.* I think so.

"'*Q.* After you got ahead you turned in slanting? *A.* Yes, sir.'

"*A.* I don't know.

"*Q.* Didn't I ask you then: 'What did you turn in for? *A.* I was going towards the curb, going slow and waiting for Buddie.' Is not that right, is that what you said there?

"*A.* I can't remember.   *   *   *

"*Q.* Now at all events after you had got some 100 feet ahead of the truck, your bicycle, or the bicycle gave way, or did you fall over?

"*A.* I don't know how it was; it went over and I fell down, and it fell on top of me.

"*Q.* Do you recollect whether the wheel broke before you fell?

"*A.* No, sir; the wheel did not break before I fell.

"*Q.* Did the tire burst before you fell?

"*A.* No, sir.

"*Q.* Well, then, you just tumbled off?

"*A.* I don't know if I did or not.

"*Q.* You tumbled off towards the curb?

"*A.* Yes, that is the way I fell.

"*Q.* Your head towards the railroad track, towards the track?

"*A.* Yes, towards the track, and my feet towards the curb, slanting like this.

"*Q.* Since you were last on the stand, you did not think of anything that made you fall?

"*A.* No, sir.

"*Q.* Didn't it strike you that your first story in Judge Mandell's room that you started to cross towards the curb is the best explanation you can have of it? Is that right?

"*A.* Yes.

"*Q.* You now say you were not cutting across?

"*A.* No, sir.

"*Q.* Did you see anybody around there at the time?

"*A.* All I seen was the wagon in front, way up in front on the same side, the same side I was on away up in front.

"*Q.* Further out?

"*A.* Yes, going the same way we was.

"*Q.* That was further up than you?

"*A.* Yes.

"*Q.* Between you and the truck with the men on it, there was not anything?

"*A.* No, sir.

"*Q.* It was bright daylight?

"*A.* Yes.  Nothing on the road that I could see.

"*Q.* Nothing on the road?

"*A.* No, sir.

"*Q.* Now, after you fell over towards the car track, where did you hit?

"*A.* I hit on my head.

"*Q.* The back of your head?

"*A.* Yes.

"*Q.* Did it hit hard?

"*A.* Yes.

"*Q.* Did you have any injuries on your head?

"*A.* Yes.

"*Q.* Is that right?

"*A.* Yes.

"*Q.* Well, the wheel did not run over your head?

"*A.* No, sir.

"*Q.* The wheel ran over your legs?

"*A.* Yes.

"*Q.* The injury you had to your head came from your hitting the asphalt?

"*A.* Yes.

"*Q.* You hit the paving when you fell so hard that you had cuts on your head for some time afterwards, didn't you?

"*A.* Only one.

"*Q.* You told the jury that you had pain in your head?

"*A.* Yes.

"*Q.* Did you say you had pain in your eyes?

"*A.* Yes.  *  *  *

"*Q.* We agree that the truck did not run over your head?

"*A.* Yes.

"*Q.* Now, then, how long were you, after you fell that way, Jimmie, were you dazed before you moved?

"*A.* I was not dazed. I was stunned, but I could see everything. It hurt my head, but I was not dazed or unconscious. I could see, but it hurt.

"*Q.* Why didn't you get up out of the way?

"*A.* I could not; I was tangled in the wheel or the pedal; it caught me in the leg right here.

"*Q.* Where were you tangled in the wheel?

"*A.* Underneath it.

"*Q.* Why didn't you climb out?

"*A.* My leg was in the wheel and I could not pull it out. My head hurt me and my leg too.

"*Q.* That is the reason you did not get out?

"*A.* Yes, the wheel was lying right on me.

"*Q.* But the wheel was light; you had fallen towards the north. How long was it before you were able to look around?

"*A.* That is the way I fell, was looking that way when I fell, my face was that way. My face was towards the automobile.

"*Q.* How long before you looked around?

"*A.* Right away I could see it coming.

"*Q.* What did you first see when you looked?

"*A.* The automobile.

"*Q.* That is, this motor car?

"*A.* Yes.

"*Q.* What did you do then?

"*A.* I tried to pull myself out of the way. I was waving like that, but the fellow didn't pay any attention to me.

"*Q.* You were waving your hand like that?

"*A.* Yes.

"*Q.* That is, at the time they were—you say they were a hundred away?

"*A.* I can't say whether it was 100 then or not.

"*Q.* Well, that is the distance you were speaking about?

"*A.* I can't say; it was coming up more and more all the time.

"*Q.* Did you keep on until they run over you waving your hand?

"*A.* No, sir; I kept waving, and I tried to holler; I hollered as loud as I could. I saw Charlie Schneider

come up alongside of the car, I went like that, and saw him facing towards the other fellow.

"*Q.* What did Charlie do?

"*A.* He was talking to the other fellow, waving his hand to the other fellow.

"*Q.* He was on his bicycle?

"*A.* Yes.

"*Q.* Don't you remember before Judge Mandell that you said Charlie jumped off?

"*A.* He did afterwards.

"*Q.* Before he waved?

"*A.* No, sir.

"*Q.* When you were waving your hand, don't you remember that?

"*A.* No, sir.

"*Q.* Did the motor car keep coming straight on right along until it ran over you?

"*A.* Yes.

"*Q.* You say that you tried to get out of the way but could not?

"*A.* Yes.

"*Q.* The only reason you could not was your bicycle had fallen on top of you and had hit your head and hurt your leg?

"*A.* Yes.

"*Q.* You would not know anything that happened after you were run over?

"*A.* No, sir; I don't remember.

"*Q.* Do you say you did not testify in the other trial that Charles Schneider got off of his bicycle 10 feet in front of the motor truck and waved to the man?

"*A.* I said I did not remember.

"*Q.* You heard Charlie Schneider talk there, is not that what he said?

"*A.* I don't remember what he said."

We have quoted thus at large from plaintiff's testimony because it is claimed it is contradictory and bears upon the duty of the trial judge to grant a new trial. Two juries have failed to agree upon a verdict in his favor, but in this trial he recovered. As against the plaintiff's evidence there stands the evidence of Heberling, Long, and Blauvelt. Heberling testified that he was looking straight ahead and driving at about 8 or 9 miles per hour, and that

he did not see plaintiff until he was under the wheel; indeed, that he did not see him then, but knew something was under the wheel, and that he made an emergency stop. Long testified that he saw plaintiff come up from behind, and:

"He tried to get ahead of the motor car, and, as he tried to turn on his bicycle, his bicycle skidded and threw him under the front wheel."

Blauvelt testified:

"He appeared to be going alongside the car like that; he put his hand like that and kinder went under the car."

All three of these witnesses testify positively that plaintiff at no time prior to the accident was lying upon the pavement 100 feet in front of the truck.

A motion for a new trial was made upon the ground (among others) that the verdict was against the weight of the evidence. In disposing of the motion for a new trial the court said, among other things:

"This is the third trial of this cause in this circuit, and presumably all the testimony which counsel desired to offer has been presented to the jury for consideration. From this testimony the jury found, as a matter of fact, under the instructions as given by the court, that the defendant company was liable for the injury. This finding I am not disposed to interfere with. The question is now presented in the record for a final determination as to defendant's liability."

This case was carefully tried. The claimed discrepancies in the testimony of the plaintiff given on the several trials presented questions for argument to the jury. There was a very sharp conflict in the testimony presenting a case peculiarly for the jury. We do not think it can be said that the court erred in declining to grant a new trial.

As to defendant's assignment of error relative to the exclusion of a report made by a patrolman who was sent by his superior officer to the scene of the accident after it had happened, the report was properly excluded. *Sterling* v. *City of Detroit*, 134 Mich. 22 (95 N. W. 986).

We do not discuss the other errors assigned, but content ourselves with saying we do not deem them well taken.

Judgment is affirmed.

Steere, C. J., and McAlvay, Brooke, Kuhn, Stone, Ostrander, and Bird, JJ., concurred.